Filed 3/9/22  In re A.R. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re A.R, a Person Coming Under the Juvenile Court Law. | B313619 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ALBERT R.<br><br>Defendant and Appellant. | (Los Angeles County Super. Ct. No. 20CCJP03824B) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Annabelle G. Cortez, Judge.  Affirmed.

Elena S. Min, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Jacklyn K. Louie, Principal Deputy County Counsel, for Plaintiff and Respondent.

————————————

Father Albert R. (Father) appeals the juvenile court's dispositional order removing his daughter A.R. from his custody. We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

A.R. was born to Amy S. (Mother) and Father in October 2020. At the time of A.R.'s birth, Mother and Father's volatile and violent relationship had already led to dependency proceedings involving A.R.'s half-siblings, Mother's son Jacob C. and Father's son Santiago R. In early December 2020, Father reported to the social worker involved with Santiago R.'s case that he (Father) had a verbal altercation with Mother that day. According to Father, Mother became angry when he left home and threatened to direct Jacob C.'s father to beat Father up.

The Department of Children and Family Services (DCFS) interviewed Father, who said Mother was bipolar and used drugs. Mother, Father reported, was "starting too much drama." If things did not go Mother's way, she would threaten Father with not seeing the baby. Father said his arguments with Mother took place over the telephone and with messages, not in person. However, he also said Mother had brought Jacob C.'s father to Father's house two weeks earlier. Father told DCFS "they handled it in the front yard."

According to Father, he and Mother were no longer in a romantic relationship. He said Mother moved frequently and said he was focused on "getting his daughter from" Mother before she left again, as well as regaining custody of his son. Father blamed Mother for paternal half-sibling Santiago R.'s removal from Father's custody. Father declined DCFS's request to meet

2

in person and would provide only a mailing address to the social worker.

When DCFS spoke with Mother by telephone the day after Father's report, she denied domestic violence with Father and said she had had no contact with him for nearly one month.  The last time she had seen Father was when he came to the location where she was staying to visit A.R. and to drop off diapers and formula.  He had only seen the baby twice.  Mother denied arguing with Father over the phone or by text message.  She reported being upset by Father's false allegations and agreed to meet in-person with DCFS.

At the in-person meeting on December 4, 2020, Mother again denied any current domestic violence with Father.  She said she had not seen Father the previous day and they did not have a verbal altercation as he had alleged.  She told DCFS Father had messaged her on social media and told her he made a report to DCFS against her because she did not want to be in a relationship with him.  Mother said she had not been in a relationship with Father and they had not lived together; she did not have Father's telephone number but he messaged and harassed her on social media.  She denied asking Jacob C.'s father to beat Father up, although she admitted asking Jacob C.'s father to message Father and instruct him to stop messaging her.  She thought Father might listen to Jacob C.'s father.  Mother did not want contact with Father, but he kept contacting her.  Mother showed the social worker a social media message in which Father called her a profane name and said he made a report because she did not know how to be in a relationship.

3

Mother blamed Father for her son Jacob C.'s removal from her custody. She confirmed she had been arrested in November 2019 for domestic violence involving an altercation with Father but stated the police report was false and she was falsely arrested. She was aware of a restraining order against her to protect Father but did not know if it was still in effect because Father had said he was going to try to have it dismissed.

On December 8, 2020, Father told DCFS that in November 2020 Mother sent her ex-boyfriend to a paternal relative's home and the two men fought. On December 9, 2020, Father called DCFS and said Mother wanted him to pick up A.R. but he did not want to do so because he feared Mother would accuse him of kidnapping. When DCFS spoke to Mother, she said she just wanted Father to take responsibility for A.R. but he was denying paternity, belittling Mother, telling her to "get raped," and saying he intended to be a family with his other child and that child's mother.

A.R. was removed from both parents by court order on December 15, 2020. That day, Mother said Father continued to harass her and message her on social media, creating fake accounts so he could continue to message her when she blocked him on her phone. He continued to belittle her and call her derogatory names. Mother reported Father said he did not care about A.R. and hoped she was removed from Mother's care. Mother provided a screenshot of messages she had received from Father that day in which he called her a "stupid bitch" and other derogatory names and mocked her for not having custody of her children. Mother denied being the aggressor in domestic violence with Father.

4

On December 17, 2020, DCFS filed a dependency petition alleging A.R. came within the jurisdiction of the juvenile court under Welfare and Institutions Code[1] section 300, subdivisions (a) (physical abuse), (b) (failure to protect), and (j) (abuse of sibling).

Both of A.R.'s half-siblings had previously been found to be subject to juvenile court jurisdiction under section 300, subdivisions (a) and (b) due to altercations between Mother and Father.[2] In the jurisdictional/dispositional report for A.R., DCFS presented information pertaining to the half-siblings' open dependency cases. In September 2020, the court sustained a petition on behalf of maternal half-sibling Jacob C. under section 300, subdivisions (a) and (b). The court found Mother and her "male companion, Albert R[.], have a history of engaging in violent altercations. On 6/24/2020, the male companion sent the mother threatening messages. On 5/19/2020, the mother drove a vehicle towards the male companion at high speeds in attempts of striking the male companion with the mother's vehicle. On 11/09/2019, the mother struck the male companion's face repeatedly, inflicting swelling to the male companion's face. The violent conduct by the mother against the male companion, endangers the child's physical health and safety, creates a detrimental home environment, and places the child at risk of serious physical harm, damage, and danger."

---

[1]     All undesignated statutory references are to the Welfare and Institutions Code.

[2]     The juvenile court also found true an allegation under section 300, subdivision (b) involving Jacob C.'s father.

In Jacob C.'s case, Mother described punching Father in the face because he called Jacob C. a derogatory term. Mother said Father "hit me before, he hit me in front of Jacob once, another time in front of his mom[,] and the other [time] it was us. He's choked me and push[ed] my head, he[']s punched my face, but I don't feel he meant to do it aggressively, you know what I mean. . . . [H]e broke into the home a couple of times and stole my car payment. Another time he tried to break into the home but the neighbor saw him . . . and they called the cops." Mother stated Father showed up at her workplace and harassed her. She described an incident in which they argued while Father was holding Santiago R.: "[H]e calls me a fucking bitch and pushes me and I fall to the ground because the street is on an uphill, I was hurt and embarrassed because he's doing this to me in front of his baby momma. I leave and I turn around[,] I drive next to him and tell him to never call me again. I didn't try hitting him with my car."

As to paternal half-sibling Santiago R., in February 2020, the court had found he was subject to the jurisdiction of the juvenile court under section 300, subdivisions (a) and (b). The court found that Santiago R.'s father, his father's female companion Amy S., and Albert R. engaged in a violent altercation in which the female companion struck father's face while he was holding Santiago R., causing father's face to swell. "The father minimized the female companion's violent conduct and intended to reside with the female companion. The father failed to protect the child. The father's female companion's violent conduct and the father's failure to protect the child endanger the child's physical health and safety and place the child at risk of serious physical harm, damage, danger and failure to protect."

6

Additionally, in November 2020, the juvenile court sustained the allegation in a supplemental dependency petition concerning Santiago R. that Father continued to have contact with Mother in violation of an active restraining order and had also failed to initially participate in drug testing and individual counseling on the subjects of domestic violence, child safety relating to exposure to domestic violence, and parenting. DCFS advised the court that Father had engaged in domestic violence with Santiago R.'s mother.

With respect to A.R., DCFS reported to the court that Mother admitted she and Father had sent threatening text messages to each other despite the restraining order. Father would threaten to report Mother to DCFS if she did not answer her phone. She denied physical altercations with Father but also admitted to once having hit Father in the face.

In last minute information provided to the juvenile court in March 2021, DCFS reported Father admitted that he and Mother did sometimes "talk trash to one another," and he claimed Mother made fake social media accounts so she could harass Father and his family. He thought Mother was attempting to improve her chances of getting custody of A.R. by setting him up to be accused of kidnapping. He suspected that when Mother said she was going to drop A.R. off with Father's grandmother, she did so in order to accuse him of kidnapping A.R. Father said, "I'm not dumb to fall for her tricks and end up arrested." Father wanted to obtain more custody of A.R. than Mother.

Father said, "When it comes down to it, why isn't [Mother] paying the consequences for what she does?  I don't want to go to jail for lies or accusations and I made the report.  It[']s documented that she tried to run me over.  And she was pregnant with my daughter and had Jacob in the car.  She doesn't think— she just acts.  I don't have any allegations against me.  Why do I have to pay for her mistakes?  All I'm doing is reporting me.  I fought back because she had 4 people jump me in front of my mom and my little sister.  I am reporting these issues, so why am I paying for her consequences?  Anyone can give birth to a kid, but she isn't doing what she needs to do[.]  Why am I paying for mistakes still?  I am getting frustrated because can I get a break[?]  Can I show the court that I am a responsible father for my kid?  I know that it's going to be harder to get our daughter back.  If a woman hits a man, they go to jail.  As a father, why do I have to pay for her mistakes?"

Father described himself as the victim of Mother's violence. He said she was the aggressor during altercations, had hit him in the past, had tried to run him over with her car, and had asked Jacob C.'s father to beat him (Father) up.  Father blamed Mother for the current dependency proceedings, saying that although the social worker said the case was opened because the parents were engaging in domestic violence via text messages, "[I]t was because [Mother] didn't check in after [A.R.] was born with DCFS."

Father continued to send Mother messages online despite the restraining order protecting him against Mother.  Mother had proceeded to post those messages on her social media, stating that Father was stalking her.  Father had enrolled in individual therapy but had not yet met with his clinician because he missed

appointments; he had also missed an appointment with his psychiatrist.

As of April 2021, DCFS reported that Father was having unmonitored contact with paternal half-sibling Santiago R. and continued contact with Santiago R.'s mother. Mother reported Father had continued to contact her via phone and social media. Father had enrolled in parent education classes but had not provided proof of enrollment in domestic violence classes. Father had been compliant with his appointments with his therapist and psychiatrist for the prior two months. Mother had completed her domestic violence class and was enrolled in individual therapy and a parenting course. She maintained contact with DCFS. Jacob C. had been returned to Mother's custody and A.R. cleared for overnight visits with her.

At the jurisdictional hearing in April 2021, the court dismissed the allegations under section 300, subdivisions (a) and (b) and found the subdivision (j) allegation true as to both parents. As sustained by the court, the allegation read, "The child A[.R.'s] mother, Amy S[.], and the child's father, Albert R[.], have a history of engaging in violent altercations in which the mother and father sent threatening messages to each other by phone. On a prior occasion, the mother threatened the father by sending [the] father of the child's half-sibling, Jacob C[.], to the father's home to threaten and fight with the father. The father continuously harasses the mother and sends the mother messages via social media calling the mother derogatory names and belittling the mother. The child's maternal half-sibling, Jacob C[.], is a current dependent of the Juvenile Court due to the father sending the mother threatening messages, and the mother driving a vehicle towards the father at high speeds in

9

attempts of striking the father. On an additional occasion, the mother struck the father's face repeatedly inflicting swelling to the father's face. The child's paternal half-sibling, Santiago R[.], is a current dependent of the Juvenile Court due to the mother's violent conduct toward the father, including the mother striking the father's face while the father held the child's half-sibling Santiago. Such violent conduct by the mother and father . . . endangers the child's physical health and safety and places the child at risk of serious physical harm, damage and danger."

The juvenile court declared A.R. a dependent child, removed her from Father's custody, and placed her with Mother, with monitored visitation to Father. The court explained that placement with Mother, who already had resumed custody of Jacob C., was appropriate because Mother had actively engaged in services, made herself available to DCFS, demonstrated insight, and made significant changes such that A.R. could be returned to her care with a safety plan and family maintenance services. Father, the court observed, had yet to address "[w]hat's at the heart of the case for the family, the altercations and the volatile relationship that the parents have." Father appeals the removal order.[3]

---

[3] DCFS has requested we take judicial notice that this dependency matter was later transferred to San Bernardino County. Although this subsequent event is irrelevant to our review of the issues presented in the pending appeal, we grant the request for judicial notice for the purpose of fashioning the disposition.

10

## DISCUSSION

Section 361, subdivision (c)(1) authorizes the juvenile court to remove a child from the physical custody of a parent if the court finds, by clear and convincing evidence, there is or would be "a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor" if the child is returned home, and there are no reasonable means of protecting the minor's physical health without removal from the parent's physical custody. Father argues there was no substantial evidence to support either of these findings. "When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. In conducting its review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011–1012.) Applying this standard, we conclude the evidence was sufficient to support the court's findings concerning removal.

A.    Substantial Danger

Substantial evidence supports the juvenile court's finding there would be a substantial danger to A.R.'s physical health, safety, protection, or physical or emotional well-being if she remained in Father's custody. Contrary to his depiction of himself as purely a victim of Mother's domestic violence, the record demonstrates that Father also had committed domestic

11

violence against Mother and that Father continued to harass Mother through social media and text messages despite being the party protected by a restraining order. This was part of a pattern: this is the third dependency case resulting from Mother and Father's conflict, and Father had also engaged in domestic violence with his prior partner, Santiago R.'s mother. Father, moreover, had previously failed to protect his son Santiago R. from Mother's domestic violence, minimized her violent conduct, and intended to reside with Mother despite Mother striking Father in the face while he held Santiago R.

Father portrayed himself as a victim paying for Mother's mistakes and took no responsibility for his actions. He blamed Mother for A.R.'s dependency case and for his loss of custody of his son. Father wielded DCFS as a weapon, threatening to report Mother if she did not comply with his wishes. He made sure she knew he was the one who reported her to DCFS and told her he did it because she refused a relationship with him. He treated the dependency proceedings as a competition won through custody allocation, suspecting Mother of attempting to engineer a kidnapping charge to gain an advantage in the custody determination and telling DCFS he wanted more custody of A.R. than Mother received. Father sought to evade accountability for his actions to the point of denying the actual basis for the dependency proceedings: He claimed that although the social worker told him domestic violence was the basis for A.R.'s dependency case, he knew the real reason was that Mother had not contacted DCFS after A.R. was born.

In light of the violence and conflict between the parents, Father's history of domestic violence, Father's continued contact and provocation of Mother through social media and text messages, and Father's denial of and refusal to take responsibility for his conduct, substantial evidence supports the juvenile court's conclusion there would be a substantial danger to A.R.'s physical health, safety, protection, or physical or emotional well-being if she was not removed from Father's custody.

Father attempts to undermine the court's finding by arguing, in essence, that Mother's conduct was worse than his, yet the court found A.R. could safely remain with her. Whether Father posed a substantial danger to A.R. if she remained in his custody is an inquiry distinct from the question of whether Mother posed a substantial danger to A.R. if she remained in Mother's custody. Moreover, although Father lays out Mother's history and her conduct in detail, he fails to acknowledge the significant distinctions between Mother and Father that justified the different outcome here. As the court explained, placement of A.R. with Mother was warranted because Mother had made significant changes. She had begun cooperating with DCFS, fully participated in services, altered her conduct, demonstrated an understanding of the problems that led to the dependency, and already successfully reunited with her other child. On this basis the court concluded A.R. could safely be placed in Mother's care subject to a safety plan and family maintenance services. In contrast, the court observed, Father had yet to address "what's at the heart of the case for the family, the altercations and the volatile relationship that the parents have."

13

B.      Reasonable Means Short of Removal

The juvenile court considered less drastic measures than removal and found there were no reasonable means to protect A.R. without removing her from Father's custody.  Father argues the evidence was insufficient to support this finding.  He contends the court's finding that reasonable means existed to protect A.R. while in Mother's custody means that reasonable means also existed to protect A.R. in Father's custody.  Like Father's comparison of himself with Mother with respect to substantial danger, this contention is based on Father's false equivalence between the parents' circumstances.  There were reasonable means to protect A.R. in Mother's custody because Mother had addressed her issues to the point where she had already regained custody of her older child.  When placing A.R. with Mother, the court found she had actively engaged in services, made herself available to DCFS, demonstrated insight, and made significant changes.  Father, as we have already discussed, had not.  He took no personal responsibility for the conditions that led to A.R.'s dependency and blamed Mother for everything.  "One cannot correct a problem one fails to acknowledge." (*In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197.)

Father proposes that the court could have maintained supervision over the child and required Father to live with the paternal grandmother, or that A.R.'s release to him could have been conditioned on Father's participation in family preservation services and enforcement of the restraining order protecting him from Mother.  Courts have recognized "less drastic alternatives to removal may be available in a given case including returning a minor to parental custody under stringent conditions of supervision by the agency such as unannounced visits." (*In re*

14

*Hailey T.* (2012) 212 Cal.App.4th 139, 148.)  This is not one of those cases.  Father fails to demonstrate a residency requirement or enforcement of the restraining order would have alleviated the court's ongoing concerns that Father had not addressed the central family problem of domestic violence.  Ultimately, Father's continued provocation of Mother despite the existence of the restraining order, his failure to address the family's domestic violence problem, his use of the dependency process to achieve personal ends, his history of failing to comply with court orders, and his evasion of responsibility for his domestic violence made less drastic solutions than removal insufficient to protect A.R.

DCFS carried its burden to show that at the time of disposition, there were no reasonable means of protecting A.R.'s health and safety without removing her from Father.  Based on the record, and taking into account the clear and convincing burden of proof required for removal (see *Conservatorship of O.B.*, *supra*, 9 Cal.5th at p. 1011–1012), we conclude substantial evidence supports the juvenile court's order removing A.R. from Father's custody.

## DISPOSITION

The judgment is affirmed.  In light of the transfer of this matter, the superior court is directed to forward this opinion to the San Bernardino County Superior Court.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


STRATTON, J.

We concur:



GRIMES, Acting P. J.



WILEY, J.

16